1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT

8 EASTERN DISTRICT OF CALIFORNIA

9

10 RAFAEL SALAS,

Plaintiff,

11

v.

12

C. PFEIFFER, et al.,

13

Defendants.

14

15

16

Case No. 1:21-cv-00669-ADA-EPG (PC)

FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED, IN PART, AND DENIED, IN PART

(ECF No. 75)

OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS

17

18      Plaintiff Rafael Salas is a state prisoner proceeding *pro se* in this civil rights action filed

19 pursuant to 42 U.S.C. § 1983. This case proceeds on Plaintiff's Fourteenth Amendment due

20 process claim against Defendants Thomas, Cortez, and Pfeiffer; Plaintiff's First Amendment

21 Free Exercise Claim against Defendants Thomas, Cortez, and Pfeiffer; and Plaintiff's Religious

22 Land Use And Institutionalized Persons Act (RLUIPA) claim against Defendants Thomas,

23 Cortez, and Pfeiffer in their official capacities. (ECF No. 28). Generally, Plaintiff's claims stem

24 from his allegations that Defendants improperly processed his marriage request, which delayed

25 him from getting married.

26      Defendants now move for summary judgment, arguing that (1) they did not

27 impermissibly burden Plaintiff's right to marry; (2) Plaintiff's claims against Thomas and

28 Pfeiffer are too vague and conclusory to proceed; (3) Plaintiff failed to exhaust a claim as to

Cortez and, in any event, she did not violate his right to marry; (4) Defendants are entitled to

1

qualified immunity; and (5) Plaintiff's request for injunctive relief to marry his fiancée, including his RLUIPA claim, is moot because he was permitted to marry her during the pendency of this case.

For the reasons given below, it is recommended that Defendants' motion for summary judgment be granted to the extent that it requests dismissal of Plaintiff's request for injunctive relief, including his RLUIPA claim. However, it is recommended the motion be denied in all other respects.

## I.      BACKGROUND

### A.      Summary of Plaintiff's Claims

Plaintiff alleges as follows in his complaint. Plaintiff is a practicing Messianic Jew.[1] Since 2010, Plaintiff has been studying and practicing Judaism as his personal religious belief. As part of his beliefs, he concluded that he and his then fiancée, Heather Tower,[2] were required to be united in holy matrimony and they shall become one.

In early 2020, Plaintiff filed his first grievance against Kern Valley State Prison employees for refusing to provide marriage forms. It took four months and a grievance for Plaintiff to receive his requested marriage forms.

After filling out the marriage forms, attaching the required birth certificates of Plaintiff and his fiancée, and sending the necessary funds to prison officials, neither Plaintiff nor his fiancée were contacted on the status of their marriage request.

After more than three months with no answer, in around July of 2020, Plaintiff filed another grievance, in which he contended prison officials intentionally forestalled, and thus refused, to grant authorization to marry. This denied Plaintiff the ability to practice his belief, for marriage is a required commandment of his Jewish religion, which he must fulfill.

In a grievance response dated August 14, 2020, Godwin, the Chief Deputy Warden, approved Plaintiff's grievance and ordered Defendant Thomas, a Correctional Counselor II, to review the marriage packet for completion by July 29, 2020. However, Defendant Thomas did

---

[1] For readability, minor alterations, such as correcting misspellings, have been made to Plaintiff's quotations without indicating each change.

[2] Plaintiff and his fiancée have since married and she has changed her name. However, for sake of consistency, the Court uses "Heather Tower" throughout these findings and recommendations, rather than "Heather Salas."

not complete the review at the appointed deadline. Instead, Defendant Thomas delegated his responsibilities to a lower ranking Correctional Counselor, Defendant Cortez.

On August 18, 2020, Defendant Cortez notified Plaintiff that the marriage packet was still being reviewed. On August 26, 2020, Plaintiff spoke to his fiancée. She was told to inform Plaintiff that the marriage process is on hold until Plaintiff clarifies whether he was previously married, and that he should contact Defendant Cortez.

On August 16 and 30 of 2020, Plaintiff notified Defendant Cortez that he is legally single and that he mistakenly documented that he was married to his ex-girlfriend (Marisela Flores), because they had planned on getting married but broke up. On August 27 and September 21 of 2020, Defendant Cortez said that Plaintiff's ex-girlfriend is listed as his wife on his C-File, and based on this information, denied the marriage request.

On September 2, 2020, Plaintiff "thrice" contacted Defendant Thomas via a CDCR 22 Form, notifying him that Defendant Cortez refused to consider Plaintiff's personal details about not actually being married. Plaintiff made Defendant Thomas aware that Defendant Cortez used inaccurate information to deny his marriage request. Plaintiff reminded Defendant Thomas that his fiancée provided a background check that confirmed that Plaintiff is not married but listed as single. Defendant Thomas failed to provide a required response.

On September 7, 2020, Plaintiff contacted the Warden, Defendant Pfeiffer, via a CDCR 22 Form. Plaintiff notified Defendant Pfeiffer that Plaintiff was being denied authorization to marry based on inaccurate information. Plaintiff explained that Defendant Cortez failed to consider Plaintiff's claim that he is not married, and that she did not bother to verify the validity of Plaintiff's claim. Defendant Pfeiffer was made aware that a background check was provided that attested that Plaintiff is not married. Moreover, Defendant Pfeiffer was reminded that his correctional counselors are required to notify prisoners of their legal requirements and help them obtain approval, and that California Department of Corrections and Rehabilitation (CDCR) employees should assist in getting qualified help. Plaintiff put Defendant Pfeiffer on notice that "it is SALAS's religious beliefs to have a wedding ceremony." Plaintiff asked Defendant Pfeiffer to intercede.

Defendant Pfeiffer failed to provide the required response. Instead, on September 17,

2020, Defendant Thomas responded to the request addressed to Defendant Pfeiffer. Defendant Thomas claimed that he needs a verified document from the Court or Hall of Records that shows that Plaintiff has never been married, and that an internet background check is not a legal document. Defendant Thomas advised Plaintiff to file a grievance.

Plaintiff is informed and believes that his fiancée spoke to Court and Hall of Records officials, who informed her that no such record would exist that simply states that Plaintiff has never been married. Plaintiff is aware that Defendant Thomas was aware of this detail yet continued providing dead-end advice.

On September 21, 2020, Plaintiff sent Defendant Pfeiffer a Request for Supervisor Review, attached with a signed affidavit, which declared that Plaintiff is not married. Plaintiff notified Defendant Pfeiffer that staff placed a substantial burden on his ability to exercise his fundamental rights by forcing him to retrieve a legal document that states he was never married, which does not exist. Plaintiff asked Defendant Pfeiffer to intervene. Defendant Pfeiffer failed to provide the required response again.

On September 7, 2020, Plaintiff contacted Defendant Cortez and placed her on notice that CDCR policy and procedure requires counselors to notify prisoners of the legal requirement and assist them in getting approval for the wedding ceremony. Also, CDCR employees must help prisoners obtain qualified assistance for their legal problems. Defendant Cortez failed to provide the required response and assistance.

On September 18, 2020, Plaintiff filed another grievance, contending that CDCR employees are denying him the freedom to marry and are violating his religious freedoms. In early October of 2020, his grievance was denied on the mistaken finding that CDCR employees did not violate CDCR policy. On October 11, 2020, Plaintiff sent the grievance to the Third Level for final review.

On October 26, 2020, Hall of Records official Albert Menaster sent Plaintiff a letter, which was prompted by Plaintiff's request for documentation showing he was never married. Mr. Menaster said he was unable to locate Plaintiff in the system. Thus, Plaintiff was unable to obtain documentation that Defendants Cortez and Thomas required him to retrieve in order to be able to get married.

On November 10, 2020, Plaintiff spoke to Defendant Cortez regarding the marriage request. Defendant Cortez refused to provide assistance, claiming she had done her job. Additionally, Defendant Cortez said she would not accept any further information from any outside source and that she only considers information that is found in a prisoner's C-File. Plaintiff reminded Defendant Cortez that, as part of her job, she is required to assist Plaintiff until he receives approval for his wedding ceremony, and if legal problems should arise, Defendant Cortez is required to provide Plaintiff with someone who is qualified to assist him. Defendant Cortez "conceded," and said that she would contact the litigation coordinator so that the matter could be resolved and Plaintiff could get approval to get married.

Plaintiff thanked Defendant Cortez for her cooperation. However, as Plaintiff was headed outside, Defendant Cortez began yelling out, "NO NO NO!" Plaintiff walked back to her office and asked if she was talking to him. Defendant Cortez replied, "No No No, she's white, just file a 602 grievance. . . ."  Plaintiff reminded Defendant Cortez that he filed numerous grievances which got him nowhere. Defendant Cortez responded, "I don't care, just file a 602."

On January 11, 2021, the Los Angeles Superior Court sent Plaintiff a legal document stating that the Clerk of the Court made a thorough search for public records from January 1, 2000, to January 11, 2021, for the name of Rafael Salas, and that the search disclosed no records. This response was prompted by a letter that Plaintiff sent to the Clerk of the Superior Court in which he requested documentation showing that he was never married.

In March of 2021, Plaintiff submitted a CDCR 22 Form to Defendant Cortez, notifying her that he had obtained the sought-after legal documentation from the Hall of Records and the Court, which states there is no record. Plaintiff requested an interview so that he could provide said documents. Plaintiff also asked Defendant Cortez to verify and accept the documentation, and thus grant Plaintiff approval for a wedding ceremony. Defendant Cortez ignored Plaintiff's request and failed to take necessary action.

As a follow-up, Plaintiff contacted Defendant Thomas via a CDCR 22 Form, and made him aware that designated staff failed to respond to the matter. As such, Plaintiff asked Defendant Thomas for an interview so that Plaintiff could provide the documents to Defendant Thomas. Plaintiff also asked Defendant Thomas to verify and accept the documentation, and thus

grant Plaintiff approval for a wedding ceremony. Defendant Thomas ignored Plaintiff's request and failed to provide any remedy.

Plaintiff brings a claim for a violation of his Fourteenth Amendment right to marry, violation of his First Amendment right to exercise his religion, and violation of the Religious Land Use and Institutionalized Persons Act of 2000.

### B.      Motion for Summary Judgment

Defendants raise five arguments on summary judgment. (ECF No. 75). First, citing the factors from *Turner v. Safley*, 482 U.S. 78 (1987), they argue that they did not improperly burden Plaintiff's right to marry. Second, they argue that Plaintiff's claims against Thomas and Pfeiffer are too vague and conclusory to proceed. Third, they argue that Plaintiff failed to exhaust his claim that Cortez refused to help him because his fiancée was white because the pertinent grievance did not mention this allegation. Alternatively, they argue that Plaintiff's claim against Cortez is essentially one for failure to assist him in getting married, which is not cognizable. Fourth, they argue that they are entitled to qualified immunity because there is not clearly established caselaw governing the facts at issue here. Fifth, they argue Plaintiff's request for injunctive relief to marry Heather Tower, including his RLUIPA claim, is moot because he was permitted to marry her during the pendency of this case.

In support of their motion, Defendants have provided excerpts from Plaintiff's deposition and various documents relating to Plaintiff's attempts to get married, including prison documents indicating that Plaintiff was married to Marisela Flores, grievance documents, and information Plaintiff provided to try to prove he had never married Marisela Flores.

Plaintiff opposes summary judgment. (ECF No. 85). First, he argues that the *Turner* factors weigh in his favor. Second, he argues that his allegations against Thomas and Pfeiffer are sufficient. Third, he argues that he properly exhausted his claim against Cortez, citing the numerous grievances he filed. Fourth, citing the Court's prior denial of qualified immunity in this case, he argues that Defendants' second attempt at qualified immunity should be denied. Lastly, Plaintiff acknowledges that he married Heather Tower during the pendency of this case, and he provides no developed argument for how his request for injunctive relief is not moot; however, he generally argues that his RLUIPA claim should proceed.

In support of his opposition, Plaintiff provides his declaration and various documents relating to his attempts to get married, including his marriage application, grievance documents, and information that he provided to try to prove he had not married Marisela Flores

Defendants have filed a reply, reiterating the arguments in their motion for summary judgment and opposing certain arguments Plaintiff made in his opposition. (ECF No. 86).

## II.    LEGAL STANDARDS FOR SUMMARY JUDGMENT

Summary judgment in favor of a party is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Albino v. Baca*, 747 F.3d 1162, 1169 (9th Cir. 2014) (*en banc*) ("If there is a genuine dispute about material facts, summary judgment will not be granted."). A party asserting that a fact cannot be disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials, or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party does so, "the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial," which is not a light burden, the party "must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.*; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could

reasonably find for the plaintiff."). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322. Additionally, "[a] summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

In reviewing the evidence at the summary judgment stage, the Court "must draw all reasonable inferences in the light most favorable to the nonmoving party." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011). It need only draw inferences, however, where there is "evidence in the record . . . from which a reasonable inference . . . may be drawn"; the court need not entertain inferences that are unsupported by fact. *Celotex*, 477 U.S. at 330 n. 2 (citation omitted). And "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255. In reviewing a summary judgment motion, the Court may consider other materials in the record not cited to by the parties but is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001).

In a defendant's motion for summary judgment for failure to exhaust, the defendant has the initial burden to prove "that there was an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Albino*, 747 F.3d at 1172. If the defendant carries that burden, "the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* However, "the ultimate burden of proof remains with the defendant." *Id.* "If material facts are disputed, summary judgment should be denied, and the district judge rather than a jury should determine the facts." *Id.* at 1166.

## III.  DISCUSSION

### A.  Burden on Plaintiff's Right to Marry

Defendants' first argument—that they did not impermissibly burden Plaintiff's right to marry—is aimed at the merits of his First and Fourteenth Amendment claims. (ECF No. 75, p. 13). They raise the same argument as to both claims. Noting that prison regulations impinging on

a prisoner's constitutional rights are valid under *Turner* if reasonably related to legitimate penological interests, they argue that the relevant factors here show they acted permissibly in delaying approval of Plaintiff's marriage. *See Turner*, 482 U.S. at 89 (noting that, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests," and concluding that a prison regulation infringing on marriage was not reasonably related to identified penological interests); *Jones v. Slade*, 23 F.4th 1124, 1144 (9th Cir. 2022) (using "the *Turner* factors to evaluate whether a prison regulation implicating an inmate's free exercise right [was] valid); *Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993) ("The Supreme Court has held that *Turner* applies to all constitutional claims arising in prison with the exception of Eighth Amendment claims.").

The four *Turner* factors that the Court will consider in turn are: (1) whether there is a valid, rational connection between the prison regulation at issue and the governmental interest offered to justify it; (2) whether there are alternative means for the prisoner to exercise his rights; (3) the impact that an accommodation of the asserted right would have on guards, other inmates, and the allocation of prison resources generally; and (4) the absence of ready alternatives. *Turner*, 482 U.S. at 89-90. In addressing these factors, the Court notes that neither Plaintiff nor Defendants treat Plaintiff's claims as challenging any prison regulation as facially invalid; rather, both parties limit their argument as to whether prison regulations were properly applied to Plaintiff's circumstances. Thus, the Court will likewise confine its *Turner* analysis to an as-applied challenge. *See Hargis v. Foster*, 312 F.3d 404, 410 (9th Cir. 2002) (addressing *Turner* factors in as applied challenge).

### 1.  Connection between the regulation and governmental interest

"The first *Turner* factor is the most important." *Jones*, 23 F.4th at 1135. Defendants' motion for summary judgment contains no discussion under this *Turner* factor of the applicable regulations and their connection to the governmental interest at stake. (ECF No. 75, p. 14). However, in the introduction of their brief, they briefly mention Sections 101070.1, 101070.5 and 101070.8 of the CDCR Department Operations Manual (DOM) as governing their approval

of Plaintiff's marriage application.[3]

Section 101070.1 provides, in part, as follows: "Unless legitimate penological interest would dictate otherwise, inmates shall be permitted to marry when they meet all legal and departmental requirements." Section 101070.5 sets out the legal requirements for the issuance of a marriage license and provides, in part, that California's Family Code prohibits marriage if the prisoner "is already married to another person and no final dissolution has been entered. Such a marriage would be considered to be bigamous." Section 101070.8 provides as follows:

The inmate's caseworker or a staff member designated by the facility head shall process the marriage request.

Processing the marriage request shall include:

Checking all available data on the inmate's current marital status.

Notifying the inmate of the legal requirements and assistance available in gathering documents and developing marriage plans. When necessary, this shall include verifying the recognized standing of a requested clergy.

Obtaining approval from the facility administrator for:

- The date and location of wedding.

- The allowance of up to two inmates and ten non-inmates, not including the officiant, bride and groom. Inmate guests may attend only if their Inmate Work Incentive Program is not interrupted.

Furnishing necessary information to the County Clerk or clergy. At the request of the County Clerk, the staff member facilitating the marriage may arrange for an evaluation by a CDCR psychiatrist to determine the inmate's mental competency.

Coordinating staff efforts necessary to perform the marriage when the wedding plan is approved by the institution head or designee for:

- Gate clearance of outside guests.

- Gate clearance of outside clergy.

- Arrangements for wedding photographs.

DOM § 101070.8.

Presumably relying on these regulations, Defendants argue that they had a legitimate

---

[3] Defendants link to what appears to be the 2022 version of the manual on the CDCR website; however, that link does not appear to be operational. The Court has located the 2023 version of the manual on the CDCR website (https://www.cdcr.ca.gov/regulations/wp-content/uploads/sites/171/2023/05/2023-DOM.pdf), notes that the quotations in the motion for summary judgment appear to be the same as for the 2022 version (as well as an excerpt from the manual attached to the motion for summary judgment (ECF No. 75-2, p. 63), and takes judicial notice of the 2023 manual. *See Brown v. Valoff*, 422 F.3d 926, 931 n.7 (9th Cir. 2005) (taking judicial notice of the CDCR operations manual).

penological interest in demanding "that Salas provide 'legal paperwork' showing his eligibility to marry" because "[n]ot facilitating a bigamous marriage is a legitimate penological interest because bigamy is illegal in California." (ECF No. 75, p. 14 (citing Cal. Penal Code § 281, defining bigamy)). Plaintiff counters that "[t]here is no valid or rational connection between Defendants' refusal to grant authorization to get married, nor refusal to check relevant legal documentation involving the clarification of marital status, neither was the refusal to provide assistance in the marriage process can be found to be justifiable." (ECF No. 85, p. 7). The Court believes that, at least to the framing of the relevant inquiry, Plaintiff has the better argument.

As noted above, Plaintiff does not facially challenge any prison regulation—*e.g.*, he is not arguing that the CDCR has no legitimate interest in prohibiting prisoners to engage in bigamy. Rather, he challenges whether Defendants acted properly in enforcing this regulation as to him. This is the pertinent question before the Court. *See Hargis*, 312 F.3d at 410 ("In conducting the as-applied analysis, we must determine whether there is a genuine dispute as to whether Hargis's statements in fact implicated legitimate security concerns.").

On this issue, Plaintiff has submitted a declaration, which repeats many material facts discussed above in the summary of his complaint. (ECF No. 85, pp. 18-33). Among other things, he states that he initiated the marriage process with Heather Tower in early 2020. However, from the outset the process was delayed, with prison officials taking months just to provide him a marriage application. After filling out the application and waiting months for a response, he filed a grievance, which led to a prison official ordering review of his application by July 29, 2020. However, despite this favorable determination, his application was not reviewed by the deadline. In August 2020, Plaintiff found out that prison officials wanted him to show that he had not been married based earlier prison documents indicating that Marisela Flores was his wife. Plaintiff does not dispute the existence of such documents but explained that he had only listed Flores as his wife because they had planned to get married.

Thereafter, a back-and-forth ensued with Defendants, with Plaintiff claiming that he provided a background check, affidavit, and various documents from public entities, including the Los Angeles Superior Court, that showed he had never married Flores. However, Defendant Thomas instructed him "to get verified legal documentation from the Courthouse and/or Hall of

Records" that said he was never married. (*Id.* at 21; *see* ECF No. 75-2, p. 64). Plaintiff made Pfeiffer aware that the document Thomas sought does not exist. (ECF No. 85, p. 22).

Further, he claims that Cortez told him that she would not "accept any information coming from any outside source and that she only reviews information that is found in a prisoner's C-File," adding "that she would not allow [him] to get married because [he] had initially said [he] was married." (*Id.* at 25). However, Cortez eventually "said she was going to contact litigation coordinator in order to figure out a way to resolve this so [he] can [] receive approval to get married." (*Id.* at 26). However, she quickly changed her mind stating, "NO NO NO, she's white, just file a 602." (*Id.*).

Plaintiff also asserts that "at no point did [D]efendants instruct [him] to obtain records from the Los Angeles County's Marriage Records," as they now indicate he should have done in their motion for summary judgment. (*Id.* at 24). However, he states that he did receive a response from the Registrar-Recorder from the person at the Marriage Records Section for Los Angeles County stating that the Office could not provide him "with the requested documentation, and· advis[ing] [him] to contact the [A]merican consulate or embassy for additional assistance." (*Id.* at 24, 93).

Plaintiff asserts that he had a conversation with Associate Warden Stark, who allegedly said, "The prison will not accept any legal documentation from prisoners under any circumstances," and to have the Court send documents directly to the prison. (*Id.* at 32). However, Plaintiff was eventually able to get married on May 5, 2022, based on his initial marriage application. (*Id.* at 33).

Defendants do not materially dispute this recitation of the efforts Plaintiff made to prove he was not married or the various delays he encountered before being allowed to marry. However, in addressing the second *Turner* factor, they state that he could have obtained a "declaration of nullity of marriage" from a California Superior Court. (ECF No. 75, p. 15). The Court sees two main problems with this argument.

First, Defendants have failed to explain how a "declaration of nullity of marriage" would have been appropriate here if in fact Plaintiff had never been married. Notably, the provision that Defendants cite, California Family Code § 2010, states as follows:

> *In a proceeding* for dissolution of marriage, *for nullity of marriage*, or for legal
> separation of the parties, the court has jurisdiction to inquire into and render any
> judgment and make orders that are appropriate concerning the following: (a) The
> status of the marriage, including any marriage under subdivision (c) of Section
> 308.

Cal. Fam. Code § 2010(a) (emphasis added). Such an order may be issued under this provision "[i]n a proceeding . . . for nullity of marriage." One of the cases cited by Defendants in support of their argument, describes "a successful action for nullity of marriage [as] result[ing] in a judicial determination that there never was a contract and hence there never was a marriage." *In re Marriage of Goldberg*, 22 Cal. App. 4th 265, 268 (1994). In essence, it appears that Defendants are suggesting that Plaintiff could have obtained an annulment through instituting an action (or proceeding) in the Superior Court.

Defendants provide no argument as to how an annulment action would be appropriate, however. California Family Code § 2210 states that marriages are voidable so as to be adjudged a nullity for various reasons, including where a party is underage, a party was of unsound mind, or there was fraud. Notably, all these provisions concern a situation where there has been a marriage.  However, Plaintiff claims, and Defendants do not dispute, that he was never married to Ms. Flores.  It does not appear that he could have sought an annulment, or a related declaration of nullity, in such a situation.

Second, Defendants' argument suggests that all the documents Plaintiff provided were insufficient for them to approve his marriage but a "declaration of nullity of marriage" would have been accepted. But Defendants present no actual evidence, such as a declaration from any Defendant, indicating that they would have accepted this document and permitted Plaintiff to marry. Moreover, Plaintiff has submitted evidence that Defendants would not have accepted such documentation. Notably, he claims that Cortez told him that she would only accept information from his C-File and that she would not assist him because his fiancée was white. Moreover, Defendants previously indicated in this case that a document from a California Superior Court would not have been sufficient to prove to them that Plaintiff had never been married because he could have been married in another jurisdiction:

> Although Salas allegedly attempted to prove that he was single by providing
> Defendants with a "background check" and a statement from the Los Angeles
> County Clerk of Court (ECF No. 1 at ¶¶ 13, 26), there was no ready, definitive

way for Defendants to determine that Salas was not married. *Even if Salas had never married in Los Angeles County, it was possible that he had married in another county, State, or even a foreign country.*

It is undisputed, therefore, that Salas provided prison staff with conflicting and nonconclusive evidence about whether he was legally single and hence legally eligible to marry. Given this conflicting information, Defendants were justified in denying Salas's marriage request, and the Court should grant them qualified immunity for their actions.

(ECF No. 34, p. 4 – Defendants' reply in support of their motion to dismiss) (emphasis added).

In short, viewing Plaintiff's evidence in a light most favorable to him, there is a genuine dispute of fact as to whether the application of any prison regulation in denying Plaintiff's permission to marry was justified and reasonably related to legitimate penological interests.

### 2. Alternative means

Under the second factor, the Court considers whether there is an alternative means of exercising the right at issue. Defendants frame the question as "whether Salas had a way of exercising his right to marry" and claim he could have "had he provided Defendants with the legal documents they had requested," relying on their argument, discussed above, that he could have obtained a nullity of marriage. (ECF No. 75, p. 15). Plaintiff argues that there were no other avenues available concerning his right to marry. (ECF No. 85, p. 8).

As an initial matter, the Court disagrees with Defendants' presentation of the issue. The inquiry focuses on an alternative means of exercising a right in light of the applicable prison regulation, with more deference to prison officials where other avenues are available to the prisoner. *See Turner*, 482 U.S. at 90 ("Where other avenues remain available for the exercise of the asserted right, courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . .  in gauging the validity of the regulation.") (internal quotation marks and citations omitted). In this as applied-challenge, Defendants do not argue that Plaintiff had alternative means of exercising his rights absent their denial of his marriage application; rather, they simply contend that he should have followed their dictates to obtain permission to marry.

This is confirmed by the relevant policies.  DOM § 101070.1 only permits inmates to "marry when they meet *all legal and departmental requirements*." (Emphasis added). And § 101070.8 sets out the guidelines for prison staff to process a marriage request, including

requiring a check of "all available data on the inmate's current marital status," "[f]urnishing necessary information to the County Clerk or clergy" and "[c]oordinating staff efforts necessary to perform the marriage when the wedding plan is approved by the institution head or designee for" things such as "[g]ate clearance of outside guests." Thus, Plaintiff did not have an alternative means of marrying other than with the permission of the prison.

In any event, as addressed above, there is a material dispute of fact as to whether Plaintiff could have obtained, and Defendants would have accepted, a nullity of marriage order.

Accordingly, there is at least a genuine dispute of fact as to whether there were alternative means of exercising the right at issue.

### 3. Impact of the accommodation

The third factor "is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. For this factor, Defendants argue that "the Court should consider how Salas's request might have impacted Flores," arguing that "granting Salas's marriage request could have severely prejudiced Flores without giving her a chance to defend her legal rights and those of her children." (ECF No. 75, pp. 16-17). Plaintiff argues that Defendants misunderstand this factor by focusing on potential harm to Flores rather than the impact on prison interests. (ECF No. 85, p. 8). The Court agrees with Plaintiff.

Notably, the *Turner* factors are an acknowledgment of the principle that a certain amount of deference is owed to prison official because "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Turner*, 482 U.S. at 84-85. Thus, "[w]hen accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Id.* at 90.

Accordingly, Defendants have failed to offer factual or legal argument regarding the impact accommodation of the right would have on guards and other inmates, or allocation of prison resources.

\\\

### 4.   Absence of ready alternatives

The final factor is the absence of ready alternatives, which, if present, indicate the reasonableness of a prison regulation. *Id.* Defendants argue that "[h]ere, there was none. Although Defendants could have approved the marriage request without first demanding that Salas demonstrate his eligibility to marry, that option carried the risk of severe prejudice to Flores, as just discussed." (ECF No. 75, p. 17). Plaintiff argues that "this is not a situation where other alternative means are available to [P]laintiff—[he is] either allowed to marry or [he is] not." (ECF No. 85, p. 8-9).

Once again, Defendants' argument assumes the facts in their favor—that they had no option other than to deny Plaintiff's right to marry or risk endorsing bigamy.  As discussed above, there is a genuine issue of material fact on this issue.

### B.   Claims against Thomas and Pfeiffer

Defendants next argue that "Salas is attempting to assert 'failure to supervise' claims against Thomas and Pfeiffer" and he has no evidence to support such claims and thus the Court should enter judgment for them. (ECF No. 75, p. 17). In screening this case, the Court has already effectively addressed this issue.

Notably, in the Court's screening order, the Court concluded that Plaintiff had appropriately alleged that both Thomas and Pfeiffer violated his rights. (ECF No. 15, pp. 11-12). Among other things, Defendant Thomas responded to the CDCR 22 Form Plaintiff sent to Defendant Pfeiffer. This form stated that the denial was based on inaccurate information, that Plaintiff was never married, and that a background check was provided showing that Plaintiff was never married. Defendant Thomas responded by telling Plaintiff that he needed a verified document from the Court or Hall of Records that shows that Plaintiff has never been married. This form is now evidence on the record, being attached to Defendants' motion for summary judgment. (ECF No. 75-2, p. 64). Notably, as discussed above, there remains a material dispute about whether Defendants properly denied Plaintiff's marriage application based on the records he provided and the records they demanded, which may not exist. Thus, there is a material dispute as to whether Thomas, by his own conduct, acted properly regarding Plaintiff's marriage application.

As to Defendant Pfeiffer, Plaintiff alleges that he sent him a Request for Supervisor Review. (ECF No. 85, p. 22). He made Pfeiffer aware that Thomas sought a document that "does not exist." (*Id.*). In the Request for Supervisor Review Plaintiff offered to provide a signed affidavit stating that he is not married. (*Id.*). Despite being informed that staff were preventing (or assisting in preventing) Plaintiff from getting married without a legitimate justification, Defendant Pfeiffer, who, as the Warden, appears to have at least some control over the approval of marriage applications, did not correct the issue.

Importantly, Defendants Thomas and Pfeiffer have not disputed such evidence, nor have they produced any of their own evidence to show that they had no involvement or authority concerning Plaintiff's marriage application. Given these circumstances, summary judgment is improper.

### C.   Additional Allegation as to Cortez

Defendant Cortez additionally argues that she is entitled to summary judgment for two reasons: "First, Salas failed to administratively exhaust this claim, as required by the Prison Litigation Reform Act (PLRA). Second, Salas's allegations—even if true—do not demonstrate that Cortez interfered with his right to marry." (ECF No. 75, p. 18). The Court addresses each argument in turn.

#### 1.   Exhaustion

Section 1997e(a) of the Prison Litigation Reform Act of 1995 (PLRA) provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Prisoners are required to exhaust the available administrative remedies prior to filing suit. *Jones v. Bock*, 549 U.S. 199, 211 (2007); *McKinney v. Carey*, 311 F.3d 1198, 1199-1201 (9th Cir. 2002) (per curiam). The exhaustion requirement applies to all prisoner suits relating to prison life. *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion is required regardless of the relief sought by the prisoner and regardless of the relief offered by the process, unless "the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." *Booth v. Churner*, 532 U.S. 731, 736 (2001); *see Ross v. Blake*, 578

U.S. 632, 643 (2016).

   As for the notice required for a prison grievance, the Ninth Circuit has stated as follows:

> Under the PLRA, a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. The grievance need not include legal terminology or legal theories, because [t]he primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation. The grievance process is only required to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued.

*Reyes v. Smith*, 810 F.3d 654, 659 (9th Cir. 2016) (alteration in original) (citations and internal quotation marks omitted). Similarly, the Ninth Circuit has stated: "A grievance also need not contain every fact necessary to prove each element of an eventual legal claim. The primary purpose of a grievance is to alert the prison to a problem and facilitate its resolution, not to lay groundwork for litigation." *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009).

   Defendant Cortez's argument as to why Salas failed to exhaust this issue as to her is as follows: "Salas filed a number of grievances about his marriage application, but the one that Salas contends administratively exhausted his claim against Cortez was Exhibit 14 at his deposition. (Tartaglio Decl., Ex. 1 - Salas Depo. Tr. at 86:2-8.) The grievance does not allege that Cortez refused to help Salas because his fiancée was white." (ECF No. 75, p. 19). Plaintiff counters that he filed numerous grievances which served to exhaust all his claims.[4] (ECF No. 85, pp. 15-16). The Court agrees with Plaintiff.

   Importantly, Plaintiff has alleged that Defendant Cortez refused to properly process his marriage application long before she made the purported comment in November 2020 that she would not help him because his fiancée was white. (*See* ECF No. 85, pp. 18-26). As Defendant Cortez herself acknowledges, "[t]he relevant alleged conversation with Cortez happened *after* the application had already been denied." (ECF No. 75, p. 20). Nor does Defendant Cortez dispute that Plaintiff grieved issues regarding his marriage application before the conversation with her. In fact, Defendant Cortez has provided as an exhibit a grievance dated September 8, 2020 (before the Cortez conversation) stating, in part, as follows:

---

[4] The parties dispute whether Plaintiff submitted a more detailed grievance, which was lost, regarding whether Defendant Cortez refused to help him with his marriage application because his fiancée was white. Because there are other grounds to deny summary judgment, the Court need not address this issue.

> [S]taff continue to infringe on my right to marry. On First Level, relief was allegedly granted in have CCII complete review of the marriage packet by 07/29/20. Instead, CCI Cortez conducted a perfunctory review and denied the request based on inaccurate information that Salas is married with Mariesla Flores. Mr. Salas explained that in 2010 they were going to get married but broke up and thus never married. Yet, Cortez still denied the said request without verifying Salas's claim. Fiancée provided CCII with a background check on Salas showing he was never married. CCII failed to verity the validity of this information and misled Fiancée on a wild good chase by advising her to retrieve legal documentation from the Courthouse or the Hall of Records to attest that Salas was never married. Fiancée did contact [these] agencies and was told such document[s] do not exist. CCII was made aware of this and told Fiancée just file a grievance because I don't know what you should do.

(ECF No. 75-2, p. 48).

Consistent with the caselaw above, the grievance sufficiently alerted the prison to the problem—Plaintiff's issues having his marriage application approved—and specifically implicated Defendant Cortez as a person responsible. The fact that Defendant Cortez is alleged to have made a statement providing an additional, and illegitimate, reason for not properly processing the marriage application—because Plaintiff's fiancée was white—does not mean that Plaintiff had to file another grievance. *See Holley v. Swarthout*, No. CIV S-10-0615 MCE, 2011 WL 3875868, at *3 (E.D. Cal. Sept. 1, 2011), *report and recommendation adopted*, 2011 WL 4566413 (E.D. Cal. Sept. 29, 2011) (concluding that a plaintiff, who filed a grievance as to a first alleged race-based lockdown, did not need to file a second grievance as to a later alleged race-based lockdown because "a plaintiff is not always required to exhaust administrative remedies for every individual event alleged in a complaint"); *Corona v. Knowles*, No. 1:08CV00237LJODLB, 2009 WL 3698510, at *3 (E.D. Cal. Nov. 4, 2009) ("[] Mr. Cruz complained of a pattern and practice at KVSP, his original administrative complaint, which specifically states that his rights were violated by KVSP's policy of imposing discriminatory lockdowns and requests relief from further violations. Exh. C, attached to Opposition. His description was therefore sufficient to alert KVSP of the nature of the wrong and he did not need to file additional grievances.").

Because Plaintiff filed at least one grievance sufficiently alerting the prison to the claim that his request for marriage was being improperly denied, Defendant's Cortez is not entitled to summary judgment based on exhaustion.

### 2.  Merits Argument

Defendant Cortez offers an alternative argument based on the merits:

> The Court has construed Salas's claim against Cortez as one regarding "barriers being placed by defendants on plaintiff in his attempts to exercise his right to marriage go through the process of getting married." (ECF No. 55 at 3.) *But the Cortez conversation does not fit this description.* At most, Cortez made (and then almost immediately retracted) an offer to informally help Salas pursue a grievance that had already been rejected. But making and then immediately retracting such an offer did not constitute a burden on Salas's free exercise and substantive due process rights. This claim is essentially one for a "right to assistance from prison staff," which Salas has conceded does not exist. (Tartaglio Decl., Ex. 1 - Salas Depo. Tr. at 51:25 to 52:7.) The Court should therefore dismiss this claim against Cortez, on the merits.

(ECF No. 75, p. 21) (emphasis added).

As Defendant Cortez notes above, the Court has already rejected attempts to construe Plaintiff as simply alleging a constitutional right to assistance.

Notably, in adopting this Court's findings and recommendations to deny Defendants' motion to dismiss, the then presiding District Judge stated as follows:

> In their objections to the pending findings and recommendations, defendants argue that this case is about "whether an inmate has a Constitutional right to have prison staff assist him in challenging an adverse decision on a prison grievance." (Doc. No. 47 at 2.) However, the focus of this case appears to in fact be on allegedly unconstitutional barriers being placed on plaintiff's right to marry. Specifically, plaintiff has alleged that he was told he needed to produce proof that he was not already married in order to proceed, but that such a document does not exist. (Doc. No. 15 at 11.) This claim asserted by plaintiff therefore has nothing to do with a right to receive assistance. Moreover, plaintiff has alleged that the prison employee responsible for helping inmates go through the process of getting married refused to provide this service to plaintiff based on the race of plaintiff's fiancée. (*Id.*) While these allegations could be construed as focusing on the right to assistance from prison staff, the assigned magistrate judge's focus in the pending findings and recommendations was on the alleged barriers being placed by defendants on plaintiff in his attempts to exercise his right to marriage. (Doc. No. 45 at 16.) The court therefore finds defendants' objections to be unpersuasive.

(ECF No. 55, pp. 2-3.)

Thus, the Court recommends that summary judgment be denied for the same reason.

### D.  Qualified Immunity

Defendants next argue that "[t]he Court should grant Defendants qualified immunity because it was not clearly established that their conduct was unlawful." (ECF No. 75, p. 21.)

They argue that they "searched for a case factually analogous to this one, but found none" and the relevant question is "whether it was clearly established that it was unconstitutional to demand that Salas provide 'legal documentation' establishing his eligibility to marry after Salas had spent years representing to CDCR that he was married to another woman." (*Id.* at 23). Citing this Court's previous denial of qualified immunity, Plaintiff argues that this Court should once again deny Defendants' argument. (ECF No. 85, p. 13).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In determining whether a defendant is entitled to qualified immunity, the Court must decide (1) whether the facts shown by plaintiff make out a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct. *Pearson*, 555 U.S. at 232. To be clearly established, a right must be sufficiently clear "that every 'reasonable  official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2090 (2012) (quoting *Al–Kidd*, 563 U.S. at 741) (alteration in original). This immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

It is clearly established law that inmates have the right to marry, "subject to substantial restrictions as a result of incarceration." *Turner*, 482 U.S. at 95. "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. Thus, the Court finds that it was clearly established prior to the date that Plaintiff filed this case that inmates have the right to marry, and that this right cannot be abridged without a legitimate basis. *See also Quiroz v. Short*, 85 F. Supp. 3d 1092, 1112 (N.D. Cal. 2015) ("The law is clearly established that inmates have a right to marry. The law is also clearly established that in order to implicate the fundamental right to marry, a state actor or regulation must directly and substantially burden that right.") (citation omitted).

In their motion, Defendants do not address the factual allegations as alleged by Plaintiff.

1   Defendants' motion argues that there is no clearly established caselaw that it was

2   unconstitutional to demand legal documents to establish that Plaintiff was eligible to marry based

3   on conflicting information indicating that he was married.  However, that is not the question

4   before the Court—this case is not proceeding based on allegations that Defendants forbade

5   Plaintiff from getting married because they legitimately believed he was married. Instead,

6   Plaintiff alleges that prison officials denied a request to get married for illegitimate reasons

7   including that he lacked a document that did not exist and because Plaintiff's fiancée was white.

8   Plaintiff alleges that he attempted to prove that he was not married and that he presented

9   evidence that he was legally single. In response, Plaintiff alleges that he was told that in order to

10  get married he needed to produce a record showing that he is not married, a record that did not

11  exist.  Additionally, Plaintiff alleges that Defendant Cortez agreed to assist him until she found

12  out that Plaintiff's fiancée is white.  This is clearly not a legitimate basis to prevent Plaintiff from

13  getting married. *See, e.g., Loving v. Virginia*, 388 U.S. 1 (1967) (invalidating a ban on interracial

14  marriage).

15      Because it is clearly established that inmates have a right to marry, and because, based on

16  Plaintiff's allegations, there is a genuine dispute as to whether Defendants had a legitimate basis

17  to deny that request, including that Defendants required Plaintiff to produce a document that

18  does not exist and refused to assist Plaintiff in getting married because his fiancée is white, the

19  Court finds that Defendants are not entitled to qualified immunity.

20              **E.    Request for Injunctive Relief**

21      Noting that Plaintiff's complaint asks for injunctive relief, "an order where Plaintiff is

22  given authorization to marry his fiancée Heather E. Tower," Defendants argue that this request is

23  moot because he married her in May 2022. (ECF No. 75, p. 24; ECF No. 1, p. 3). This argument

24  is also directed at Plaintiff's RLUIPA claim, which the Court has already noted does not permit

25  monetary damages. (ECF No. 15, p. 15 – "Thus, a RLUIPA claim may proceed only for

26  declaratory or injunctive relief against state employees acting within their official capacities.");

27  *see Jones*, 23 F.4th at 1140 n.4 ("Monetary damages are not available against prison officials in

28  their individual capacities under RLUIPA. A RLUIPA plaintiff may only sue defendants in their

official capacities for prospective injunctive relief.") (internal citations omitted).

"If there is no longer a possibility that an appellant can obtain relief for his claim, that claim is moot and must be dismissed for lack of jurisdiction." *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 521 (9th Cir. 1999); *see also Flast v. Cohen*, 392 U.S. 83, 95, 88 S. Ct. 1942, 1950, 20 L. Ed. 2d 947 (1968) ("[N]o justiciable controversy is presented … when the question sought to be adjudicated has been mooted by subsequent developments.").

Here, while Plaintiff generally argues the merits of his RLUIPA claim, he presents no argument for why it is not moot in light of his marriage in May 2022. Because Plaintiff has been granted the injunctive relief he sought—permission to marry—the Court concludes that his request for injunctive relief has been rendered moot. Thus, Defendants are entitled to summary judgment on this request for relief, including Plaintiff's RLUIPA claim.

### IV.     CONCLUSION AND RECOMMENDATION

Based on the foregoing, IT IS RECOMMENDED that:

1.     Defendants' motion for summary judgment (ECF No. 75) be granted, in part, and denied, in part.

2.     Defendants be denied summary judgment as to Plaintiff's Fourteenth Amendment due process claim against Defendants Thomas, Cortez, and Pfeiffer and his First Amendment Free Exercise Claim against Defendants Thomas, Cortez, and Pfeiffer.

3.     Defendants be granted summary judgment as to Plaintiff's request for injunctive relief, including his RLUIPA claim against Defendants Thomas, Cortez, and Pfeiffer in their official capacities.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l). Within fourteen (14) days after being served with these findings and recommendations, any party may file written objections with the Court. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections.

1    The parties are advised that failure to file objections within the specified time may

2    result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838-39 (9th Cir.

3    2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

4

IT IS SO ORDERED.

5

6    Dated:    **September 25, 2023**          /s/ *Erica P. Grosjean*

7                                              UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28